# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-62352-CIV-ALTMAN/Hunt

**NOSLEYKI TORRES**,

     *Plaintiff,*

*v.*

**WAL-MART STORES EAST, L.P.**,

     *Defendant.*

_____/

## ORDER

Who should decide whether, in weighing its important interest in reducing overhead costs against an invitee's right to amble freely through un-puddled aisles, Wal-Mart has struck the right balance? A life-tenured judge no one elected? A jury of both parties' peers? The answer—to us—seems clear. But, to help guide us to the right result, query for a moment *how* such a decision would even be made? Where, in other words, should we set that evanescent line between the rules Wal-Mart implemented and the ones it *should* have implemented? We cannot, after all, simply *assume* that Wal-Mart's procedures—whatever they are—comport with the applicable standard of care (whatever that happens to be). We must apply those procedures in the *real* world and consider them in the light of their *practical* consequences. Recall, in this respect, Justice Holmes's famous observation that "[t]he life of the law has not been logic: it has been experience."[1]

What do we mean? Suppose, for instance, that Wal-Mart had decided *never* to check for transient liquids on its floors. Suppose, too, that a man visiting a Wal-Mart store slipped on a puddle that had been left there, in the aisle, for 24 hours. Would Wal-Mart have acted *reasonably*? Most of us

---

[1] O. HOLMES, THE COMMON LAW 1 (1881).

would say *probably* not. Suppose, though, that Wal-Mart's policy was to check the aisles every hour and that a man slipped on a puddle that had been left unattended for 59 minutes: would that be reasonable? What if Wal-Mart had checked every 30 minutes? Every 15? Every 5? At what point does a single grain of sand become a mound? The point, of course, is that no federal judge can (or should) say. If we are, as we were meant to be, a democracy—and if Adams was right in suggesting that everyday jurors are the "heart and lungs" of that democracy[2]—then we should let jurors (not unelected judges) make these policy choices for us. Wal-Mart's motion for summary judgment is **DENIED**.

## THE FACTS[3]

On November 10, 2017, Nosleyki Torres was shopping in a Wal-Mart with his wife, Yulieski Gonzalez, and their daughter. *See* Gonzalez Dep. [ECF No. 32-3] at 20:22–21:3. Wal-Mart's closed-circuit television ("CCTV") shows that Torres first went down Wal-Mart's freezer aisle at 8:31 P.M. *See* CCTV [ECF No. 28] at 8:31:50. He returned to that same aisle about 15 minutes later, looking for "chimichanga or tacos" for his wife. *Id.* at 8:49:51; Gonzalez Dep. at 37:23–38:2. But, as Torres was pushing his shopping cart down the freezer aisle—with his daughter sitting in the cart—he slipped on water and fell to the ground. *See* Torres Dep. [ECF No. 32-1] at 37:11–15, 42:12–16.[4]

Although Torres testified that he didn't know how long the water had been on the floor, *id.* at

---

[2] Letter from John Adams to William Pym, 1 PAPERS OF JOHN ADAMS (Robert J. Taylor ed. Harvard Univ. Press 1977) (Jan. 27, 1766), http://www.masshist.org/publications/adams-papers/index.php/view/PJA01dg4.

[3] "The facts are described in the light most favorable to [the plaintiff]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant].").

[4] At points, Wal-Mart appears to insinuate that Torres *purposely* fell in a craven attempt to manufacture this lawsuit. *See* Wal-Mart's SOF [ECF No. 32] ¶¶ 11–25 (noting that, before he fell, Torres "appears to look at the spot at issue and . . . lookup [sic] at the ceiling," enters the same aisle various times, and "stops short of the spot" before "quickly push[ing] his shopping cart forward and fall[ing] to the floor"). Wal-Mart may well be right. And, if it is, a jury will be the one to say so. But, on summary judgment, we can't just take Wal-Mart's version of the facts as true.

2

44:7–12, he explained that, after he fell, he saw that water was "leaking from the ceiling" and that, as "the water hit the floor, it would splash," *id.* at 48:14–23. Torres's wife testified that, "after he fell we looked around for the place where the water was coming from and there was one drop dripping down from the ceiling." Gonzalez Dep. at 22:8–12. The water was dripping from the ceiling at the "exact" spot where he slipped. Torres Dep. at 48:14–23.

Wal-Mart's CCTV footage shows that Torres got up slowly from the floor and immediately grabbed his lower back, *see* CCTV at 8:50:55—apparently (according to him) in pain, Torres Dep. at 15:1–4. He then told a Wal-Mart employee, assistant manager Johnny Elas, that he'd fallen. *See* Torres Dep. at 47:17–20; Elas Dep. [ECF No. 32-2] at 45:16–21. Elas testified that Torres—who was holding his back—relayed pain down the "whole left side" of his back. Elas Dep. at 49:2–9. Elas followed Torres to the spot where he'd fallen—and, once there, he immediately saw "water on the floor." *Id.* at 50:10–12. According to Elas, the puddle—though relatively "small"—amounted to a "bottle of water." *Id.* at 50:13–23.

At his deposition, Elas testified that he wasn't "sure" where the water had come from, but he offered that "maybe the water might [have been] coming from the ceiling." *Id.* at 50:24–51:7. In fact, he added, because it had been raining that day, "probably the water [was] coming from the ceiling." *Id.* at 52:1–10.[5] And there's plenty of corroboration for this belief. Torres, for instance, recalled that,

---

[5] Specifically, Elas testified: "I was thinking like the water coming from there because sometimes it's like -- that day, it was raining. That's why I said I think it was raining that day, so that's probably the water coming from the ceiling." Elas Dep. at 52:5–9. Wal-Mart interprets this statement to mean that "it was raining on the date of the incident." Wal-Mart's Reply SOF [ECF No. 41] ¶ 48. Torres interprets the statement to mean "it was raining earlier in the day." Torres's SOF [ECF No. 36] ¶ 48. Torres's interpretation—that it had been raining earlier in the day but had stopped raining by the time Torres fell at night—appears to be the most reasonable reading of Elas's remarks. Elas (twice) said that it was raining "that day" and never suggested that it was still raining by that night—when Torres fell. Wal-Mart could have introduced weather reports, definitively settling the issue, but never did. In any event, because we must view all evidence in the light most favorable to Torres, we accept Torres's interpretation of the Elas's remarks.

when Elas got to the scene of the fall, he looked up and said that the water "was coming from the ceiling." Torres Dep. at 45:21–25. Indeed, in the accident report he filed for Wal-Mart, Elas wrote that "[w]ater from [c]eiling" had "caused the incident." Accident Report [ECF No. 37-1] at 1. Nor was this belief unsupported by past experience. As Elas later testified, the roof *had* leaked before and, "when it's raining, that's when we know it got the leak." Elas Dep. at 76:18–77:2.

The parties disagree about *how long* the water was on the ground. Wal-Mart assumes that the water was there "for less than approximately 15 minutes" because that's how much time elapsed between when "Torres first traversed the area . . . to the time he fell." Wal-Mart's Motion for Summary Judgment [ECF No. 31] ("MSJ") at 7. The inference seems to be that, because Torres didn't spot the water the first time he passed through that aisle, the puddle *could not* have been there. *Id.* Torres, for his part, suggests that the water was there for "hours." MSJ Response [ECF No. 37] at 4. After all, he says, it had rained earlier in the day; he and his wife had seen the water dripping *slowly* from the ceiling; and, given how much water had accumulated on the floor—and how slowly it was dripping—the ceiling must've been leaking for some substantial length of time. *Id.* On top of all this, pictures of the area where Torres fell appear to show at least *three* track marks, a footprint that looks to be from another customer, and drying water—all indicia that the puddle had been there for a significant period of time. *See* Torres's SOF [ECF No. 36] ¶ 49; Pictures [ECF No. 37-2] (showing post-incident photos of the water).[6] The pictures also appear to show splattered droplets of water spread out across the floor, which is consistent with water splashing as it drops from the high ceiling and hits the ground. *See generally* Pictures. The CCTV footage—which begins almost an hour before Torres fell—doesn't reveal any other spills or obvious sources of water. *See* CCTV at 7:53:55–8:50:50.

Under Wal-Mart's policies, employees have an "ongoing responsibility" to scan the floors for

---

[6] Wal-Mart questions the import of these photographs, which only further underscores that summary judgment is inappropriate here.

dangerous conditions. Elas Dep. at 25:1–27:20. In other words, "everybody working [in] the department" is obligated to make sure that there are no spills. *Id.* at 25:14–21. Since this duty is continuous, there's no "specific time to do it." *Id.* Elas explained the ongoing responsibility this way:

> Q. Exactly. There's no set time -- okay. No. If you're walking the floor, you've got to make sure you're looking down to see if there's any spills, right?
>
> A. Exactly because it's not there like -- yeah, exactly. We *always* have to check to see when you're walking. Like let's put it like that: Walk and then clean at the same time.

*Id.* (emphasis added). But, for whatever reason, on the day Torres fell, this didn't happen. *See* CCTV at 8:42:14–8:42:27. The CCTV footage, in fact, shows that only one Wal-Mart employee walked through that particular aisle in the hour or so before the incident, *id.* at 7:53:55–8:50:50—and, the footage seems clear, that employee *never* glanced down towards the floor, *id.* at 8:42:14–8:42:27. While Wal-Mart tries to justify this failure by suggesting that a customer's cart *might* have obstructed the employee's view of the water, *see* Wal-Mart's SOF [ECF No. 32] ¶ 22, Torres quarrels with this proposition, *see* Torres's SOF ¶ 22, and the video doesn't (definitively) settle the question one way or the other.

Torres blames his Wal-Mart slip-and-fall for the severe back injury he suffered. Before the fall, Torres says, he'd never experienced "any pain or discomfort" in his lower back. Torres Dep. at 16:1–12. After the fall, however, his back pain, which traveled all the way to his knee, was at a "ten." *Id.* at 27:4–10, 29:8–13. Before the fall, Torres "never" felt any discomfort while holding his daughter. *Id.* at 57:7–16. Torres now finds it very painful to carry her. *Id.* And, although Torres—who works as a handyman—still takes on various projects, he's found it more difficult to work after the fall. *Id.* at 8:3–4, 68:7–12.

Torres saw several doctors after the incident, including Dr. Julian Cameron. *Id.* at 21:9–29:2. Dr. Cameron reviewed an MRI of Torres's back and concluded that his "lower back was damaged." *Id.* at 23:24–24:18. Dr. Cameron's "Initial Report" is dated December 21, 2017—a little over one

month after Torres fell at the Wal-Mart. *See* Medical Records [ECF No. 37-5] at 38. The Initial Report

marked Torres's "DOI" (*i.e.*, date of injury) as November 10, 2017—the day of the Wal-Mart fall. *Id.*

Dr. Cameron's records note that Torres had "traumatic disc herniations of the lumbar spine." *Id.* at

39. Before turning to surgery, Dr. Cameron prescribed physical therapy. *Id.* Dr. Cameron also gave

Torres at least one injection for his back pain. *See* Torres Dep. at 24:25–25:17. When these

conservative measures failed to provide sufficient pain relief, Dr. Cameron advised Torres to pursue

a surgical option. *See* Medical Records at 92. Torres agreed, and Dr. Cameron performed surgery on

Torres's back on April 10, 2018. *Id.* at 159. Dr. Cameron's "Final Report," dated May 3, 2018 (shortly

after the surgery), noted:

> Mr. Torres will remain with a partial permanency of impairment. It is my opinion that
> based on the most recent AMA guidelines within a reasonable degree of certainty, will
> remain with a 12% impairment to the body as a whole both directly and causally related
> to the injury sustained, which led to the resultant surgery for his lumbar spine.

*Id.* at 182. Torres missed between one and three months of work after his surgery. *See* Torres Dep. at

63:7–15. While the surgery has helped a bit, Torres still experiences pain in his lower back. *Id.* at 29:4–

7.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms,

this standard provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at

248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find

for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of

a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).[7]

---

[7]     In ruling on summary-judgment motions, Florida's state courts have held that "the stacking of inferences is not permitted." *Wilson-Greene v. City of Miami*, 208 So. 3d 1271, 1275 (Fla. 3d DCA

ANALYSIS

Wal-Mart moves for summary judgment on the tort-law elements of duty (*i.e.*, notice) and causation. We address these two issues in turn.

### A.     Notice

A reasonable jury could find that Wal-Mart had *constructive* notice of the water on its floor. Under Florida law, a person who "slips and falls on a transitory foreign substance in a business establishment . . . must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it." FLA. STAT. § 768.0755(1). A "transitory foreign substance" refers "generally to any liquid or solid substance, item or object located where it does not belong." *Owens v. Publix Supermarkets, Inc.*, 802 So. 2d 315, 317 (Fla. 2001). Torres has elected to proceed under a theory of constructive notice: that Wal-Mart "should have known" of the dangerous condition. *Knoll v. Paradise Beach Homes, Inc.*, 789 F. App'x 809, 813 (11th Cir. 2019).

A slip-and-fall plaintiff may prove constructive knowledge through "circumstantial evidence," showing *either* that "[t]he dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition" *or* that "[t]he condition occurred with regularity and was therefore foreseeable." FLA. STAT. § 768.0755(1). The Eleventh Circuit has found that a period as short as ten minutes may be sufficient to put a defendant on

---

2017). In other words, "if a party to a civil action depends upon the inferences to be drawn from circumstantial evidence as proof of one fact, it cannot construct a further inference upon the initial inference in order to establish a further fact unless it can be found that the original, basic inference was established to the exclusion of all other reasonable inferences." *Cohen v. Arvin*, 878 So. 2d 403, 405 (Fla. 4th DCA 2004) (quoting *Nielsen v. City of Sarasota*, 117 So. 2d 731, 733 (Fla. 1960)).

But this "rule" obviously has no application in federal court. "Although Florida law provides the substantive rule of decision in this diversity case, we must decide the propriety of summary judgment in accordance with the federal standards fixed in Rule 56 of the Federal Rules of Civil Procedure." *Berbridge v. Sam's E., Inc.*, 728 F. App'x 929, 931–32 (11th Cir. 2018) (cleaned up). "Because a federal standard governs our assessment of whether an inference is allowable, we do not apply state-law rules against 'pyramiding' or 'stacking' inferences." *Id.* at 932.

constructive notice of a dangerous condition. *See Lebron v. Royal Caribbean Cruises Ltd.*, 818 F. App'x 918, 922 (11th Cir. 2020) (reversing directed verdict on issue of constructive notice where the "unsafe condition existed for at least ten minutes"); *see also D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 798 (11th Cir. 2019) (reversing summary judgment and finding that "eighteen minutes was a sufficient period to present a genuine issue of material fact" on question of constructive notice).

In trying to assess *how long* a substance has been sitting on a floor, courts look to several factors, including "evidence of footprints, prior track marks, changes in consistency, [or] drying of the liquid." *Palavicini v. Wal-Mart Stores E., LP*, 787 F. App'x 1007, 1012 (11th Cir. 2019). We also ask whether the "offending liquid" was "dirty" or "scuffed." *Norman v. DCI Biologicals Dunedin, LLC*, 301 So. 3d 425, 429 (Fla. 2d DCA 2020); *see also, e.g.*, *Woods v. Winn Dixie Stores, Inc.*, 621 So. 2d 710, 711 (Fla. 3d DCA 1993) ("Testimony of dirt, scuffing, or tracks in a substance generates sufficient inferences of constructive notice."); *Winn-Dixie Stores, Inc. v. Guenther*, 395 So. 2d 244, 246 (Fla. 3d DCA 1981) ("Here, testimony that the liquid was dirty and scuffed and had several tracks running through it was, in our opinion, adequate to impute constructive notice of the hazardous condition to the store manager.").[8]

Beyond the length of time, courts are more likely to find that a business had constructive notice when the business's employees were "in the vicinity of where the fall occurred." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 203 (11th Cir. 2019) (quoting *Markowitz v. Helen Homes of Kendall Corp.*, 826 So. 2d 256, 261 (Fla. 2002)); *see also Haiser v. MSC Cruises (USA) Inc.*, 2019 WL 4693200, at *5 (S.D. Fla. Aug. 9, 2019) (Smith, J.) (finding that the crewmembers "should have known about the presence of water on floor since they were in the immediate vicinity"). That's because, with employees

---

[8] It's no surprise that courts often rely on these little nuggets of circumstantial evidence. After all, a customer shopping in a store doesn't tend to notice the puddle before he slips on it. And, even if he had, he'd rarely have occasion to measure the amount of time that elapsed between the substance's appearance on the floor and his encounter with it.

in the area, a jury can reasonably infer (at least where the condition is visible) that those employees *should have seen* the dangerous condition.

Drawing all reasonable inferences in Torres's favor, we think a jury *could* find that Wal-Mart *should* have known about the puddle Torres slipped on.

*First*, there's evidence that the water had been accumulating for a significant period of time. For starters, the water was (apparently) dripping quite slowly from the ceiling. Torres's wife, for example, explained that she saw only "one drop dripping down from the ceiling," *see* Gonzalez Dep. at 22:8–12, and Wal-Mart's assistant manager (Elas) saw *no water* dripping from the ceiling while he was looking for the leak, *see* Elas Dep. at 52:3–4. Given the amount of water on the floor, *see* Pictures, we think it reasonable to infer that the water had been leaking for a while before it achieved the size we see depicted in the pictures. Elas's testimony, in fact, supports this inference. Elas, remember, testified that it had rained *earlier* in the day, making it unlikely that the water suddenly appeared just before Torres slipped. *See* Elas Dep. at 52:5–9. And the photos of the puddle bear all the indicia of water that had been sitting for some time: a footprint from another customer, at least *three* track marks from different shopping carts, and the evident effects of evaporation (a process that, as any middle schooler knows, takes time). *See* Pictures; *cf.* Bill Nye the Science Guy, *The Water Cycle*, YOUTUBE (Mar. 1995), https://www.youtube.com/watch?v=7fkR9foB0cU ("What do you think happens to the water I squirted on the photographer? . . . The water will disappear *after a while*." (emphasis added)).[9] When the evidence is viewed in the light most favorable to Torres, a jury could easily find that the water had been accumulating for hours.

*Second*, we have a Wal-Mart employee walking in the immediate vicinity of the puddle just

---

[9] Notably, the footprint appears to be from someone *other* than Torres. That's because, in the CCTV footage, Torres's foot slides as he falls. *See* CCTV at 8:50:50. The footprint in the photographs, however, appears intact—without the sliding effect one would expect to see in the footprints of a man who'd fallen. *See* Pictures.

moments *before* Torres fell—a fact that further supports Torres's position that someone at Wal-Mart *should* have known. As we've explained, the CCTV footage shows that, a few minutes before Torres fell, a Wal-Mart employee walked through that very same aisle without ever looking down at the floor, *see* CCTV at 8:42:14–8:42:27—a clear violation of Wal-Mart's standard policies, *see* Elas Dep. at 25:1–27:20 (explaining that Wal-Mart employees "*always* have to check to see [if there's anything on the floor] when [they're] walking" (emphasis added)). And there's good reason for this policy. As Elas himself explained, the roof in that particular Wal-Mart tends to leak when it rains, *id.* at 76:18–77:2—a factor that should've put Wal-Mart's employees on high alert for dangerous puddles on what was indisputably a rainy day, *id.* at 52:5–9 (Elas testifying that it had rained *that day*).

The Eleventh Circuit's treatment of similar cases lends further support to this result. Take *Doudeau v. Target Corp.*, 572 F. App'x 970 (11th Cir. 2014), for example, where the Eleventh Circuit found a genuine dispute on the question of constructive notice and reversed the district court's order granting Target's motion for summary judgment. In that case, as here, "it had been raining," and an employee who helped the plaintiff off the ground had opined that "the water must have been tracked in from outside." *Id.* at 971–72. As in our case, a Target employee had walked past the area where the slip occurred only four minutes before the fall; unfortunately, "his gaze [was] not on the floor but instead at the customers." *Id.* at 972. The surveillance video did "not reveal any water being spilled on the floor between [the employee's] walkthrough and [the plaintiff's] fall." *Id.* From this, the court inferred—as we do—that "the water could have been on the floor long enough for Target to discover it." *Id.*

A very similar thing happened in our case. It had been raining earlier in the day, and there's evidence that that rain made its way through a leak in the ceiling and onto Wal-Mart's floor. An employee passed by the puddle just moments before the fall *without* glancing down at the floor. And the surveillance video reveals *no* spill between the employee's walkthrough and Torres's fall. As in

*Doudeau*, these facts are more than sufficient to raise a reasonable inference that the water was there long enough for the employee to have spotted it.[10]

A similar series of events animated the decision in *Lebron*, 818 F. App'x at 918, where the Eleventh Circuit reversed the district court's order granting the defendant's motion for a directed verdict on the question of constructive notice. The *Lebron* plaintiff tripped on an ice-skating rink. *Id.* at 919. After the district court issued its directed verdict for Royal Caribbean, the Eleventh Circuit found that the "jury was entitled to find Royal Caribbean had constructive notice of the gouge in the ice" based on three facts—all present in our case. *Id.* at 922.

*One*, the court pointed to Royal Caribbean's "general knowledge of the unsafe condition at issue"—a conclusion it reached (in part) because of an employee's testimony that "it is important to maintain and resurface the ice to prevent accident and injury." *Id.* Similarly, here, Wal-Mart's assistant manager (Elas) testified that, in the past, the Wal-Mart roof had leaked when it rained and acknowledged how important it is for employees to look for spills—as a necessary mechanism for preventing accidents. *See* Elas Dep. at 24:9–13, 76:18–77:2.

*Two*, the *Lebron* panel pointed to testimony that, on the day in question, "gouges in the ice were readily visible ten to fifteen minutes prior to [the plaintiff's] fall," which established "that the unsafe condition existed for at least ten minutes and that the condition was detectable by a lay person on or around the ice." *Lebron*, 818 F. App'x at 922. Here, too, the circumstantial evidence—the tracks, the footprint, the evaporation, and the absence from the CCTV footage of any noticeable spill in the hour before Torres fell—strongly suggests that the puddle had been allowed to sit in that aisle for some protracted period of time. *See* Pictures. And the facts indicate that the water was easily noticeable.

---

[10] Indeed, Torres's case is, in some ways, even stronger. In *Doudeau*, the puddle "had no tracks or footprints in it." 572 F. App'x at 971. Here, by contrast, the puddle had three tracks, along with one footprint, and signs of drying—all indications that it had been around for a while. *See* Pictures.

*See* Elas Dep. at 50:10–12 (testifying that he saw the water once he "got to the scene of the incident").

*Three*, "provid[ing] the final inference for constructive notice," three employees were "stationed in the immediate vicinity of the ice, one of whom was specifically tasked with watching the ice." *Lebron*, 818 F. App'x at 922. Our case is the same: a Wal-Mart employee—tasked with scanning the floors and failing to do so—walked down the very same aisle in which, just minutes later, Torres would fall. CCTV at 8:42:14–8:42:27 (showing the employee walking through the aisle); Elas Dep. at 25:1–27:20 (explaining that Wal-Mart employees have an "ongoing responsibility" to look out for dangerous conditions on the store's floors).

Then there's *Castellanos v. Target Corp.*, 568 F. App'x 886 (11th Cir. 2014), where the Eleventh Circuit affirmed a jury verdict for a slip-and-fall plaintiff based on "the approximately two-foot size of the puddle of bleach, the distinctive odor of bleach, the presence of tracks not made by plaintiff or her husband through the puddle, and the proximity within about ten feet of the puddle of defendant's employees." *Id.* at 886. Our case is very similar: a sizeable puddle, tracks and footprints that (at least) appear to have been made by someone *other* than our Plaintiff, the absence of any evidence of a spill in the hour before the fall, and a nearby Wal-Mart employee.

And those decisions barely break the surface. *See, e.g.*, *Plott*, 786 F. App'x at 202–03 (using circumstantial evidence to conclude that rain water had been on the ground "for about half an hour," noting that "two crewmembers [were] working" nearby, and finding that "a reasonable factfinder could conclude that those crewmembers knew or should have known about the wet . . . floor"); *Maxwell v. Carnival Corp.*, 2021 WL 1969967, at *6 (S.D. Fla. Mar. 18, 2021) (Bloom, J.) (denying summary judgment where the evidence indicated "that the food spill was on the floor for a period long enough for at least one other person to walk through it and for Defendant to have constructive notice of the substance"); *Snider-Hancox v. NCL Bahamas Ltd.*, 2018 WL 6308683, at *6 (S.D. Fla. Sept. 26, 2018) (Martinez, J.) (denying summary judgment where there was "a footprint in the liquid as well

13

as dirt and grime in the puddle prior to the fall," and the area "was being staffed by at least three . . . employees at the time of the accident" who "could have noticed a liquid on the ground and understood the safety concern of that condition"); *Garcia v. Target Corp.*, 2014 WL 505151, at *3 (S.D. Fla. Feb. 7, 2014) (Marra, J.) (denying summary judgment where "there were footprints in the water on the floor . . . despite the fact that there is evidence that it was not raining the day Plaintiff fell in the store," raising "a genuine issue of material fact as to whether Defendant knew there was water on the floor but ignored it or should have discovered it earlier"); *Williams v. Carnival Corp.*, 440 F. Supp. 3d 1316, 1322 (S.D. Fla. 2020) (Torres, Mag. J.) (finding that Carnival had constructive notice of water on the ground where "a slow drip of water coming from a leaky ice chest immediately next to the puddle of water" could have taken "hours" to pool into a two-foot puddle, and noting that Carnival, like Wal-Mart here, had "employees working close to the [water] trained to look for and remedy wet decks"); *Erickson v. Carnival Cruise Lines, Inc.*, 649 So. 2d 942, 943 (Fla. 3d DCA 1995) ("We conclude that the source of the puddle (i.e. ceiling leak) as well as the size of the puddle were sufficient to create a jury question as to whether this hazardous condition existed for a sufficient period of time to charge appellee with constructive notice and to invite corrective measures.").

Against all this, Wal-Mart advances two arguments—both unavailing.

*First*, Wal-Mart claims that our facts "do not differ" from the situation the Eleventh Circuit confronted in *Berbridge v. Sam's East, Inc.*, 728 F. App'x 929 (11th Cir. 2018). *See* MSJ at 5–7. But that's just not true. In that case, the plaintiff slipped on water that had been dripping from an AC unit. *Berbridge*, 728 F. App'x at 930–31. The Eleventh Circuit found precious little evidence that the water "had been on the floor for a sufficient length of time to charge the store owner with constructive knowledge of its presence." *Id.* at 932. In saying so, however, the court relied on two facts—both absent here. *One*, there was no "evidence of footprints, prior track marks, change in consistency, drying of the liquid, or other evidence suggesting that the substance was on the floor for [a sufficient] length

of time." *Id.* Although the plaintiff described the water as "dirty," the court pointed out that the water could've been dirty "when it fell from the AC unit." *Id.* In our case, by contrast, there *were* footprints, track marks, and signs of evaporation—the *very kinds of evidence* that the court found missing in *Berbridge*. *Two*, left only with the plaintiff's own description of the water as "medium size" and "[not] that big," the court said "[w]e . . . don't know the size of the substance" and added that, "[h]ad the puddle on the floor been large, that could have suggested, in light of the slow dripping observed by Berbridge, that the AC unit had been leaking for a while." *Id.* Here, however, we have photographic evidence of a sizeable puddle that, given how slowly the water was dripping from the ceiling—*see* Gonzalez Dep. at 22:8–12; Elas Dep. at 52:3–4—must have taken a long time to form. *Berbridge*, then, supports our conclusion here.[11]

Second, Wal-Mart disputes some of Torres's factual assertions. For starters, it says that the water could not have been there for more than "15 minutes and 50 seconds" because Torres and his wife didn't see the water the first time they walked through the aisle. MSJ at 7. But that's not the only inference we can draw from the facts—or even (necessarily) the most reasonable one. When customers walk through a store—looking for products, filling their carts, and (as here) wrangling their small children—they typically don't have the time (or the presence of mind) to ogle the ground for hazards. Nor should they have to. These customers understandably trust Wal-Mart to keep its stores safe and its floors clean. And so, we find rather immaterial Torres's failure to spot the puddle sooner.

---

[11] Wal-Mart also relies on the Eleventh Circuit's decision in *Pussinen v. Target Corp.*, 731 F. App'x 936 (11th Cir. 2018). There, the plaintiff fell on a liquid in the toy aisle of a Target. *Id.* at 937. But the plaintiff in that case *conceded* that "the liquid was clear and had no track or dirt marks in it." *Id.* at 939. The court thus saw "no signs of age" and found that the "record lack[ed] *any* evidence from which a reasonable jury could conclude that the liquid had been on the floor for a period long enough to charge Target with constructive knowledge." *Id.* (emphasis added). Our case couldn't be more different. The puddle Torres slipped on bore several of the telltale "signs of age"—from track marks to signs of drying and an extraneous footprint. And, based on the slow drip and the sizeable puddle, the water must have been there for a while. *Pussinen* thus cannot guide us here.

Next, Wal-Mart contends that its nearby employee couldn't have seen the puddle because, when the employee passed, "the spot was obscured by a shopping cart." *Id.* at 10. But Torres disputes this contention, and the CCTV tape is decidedly inconclusive on the question—a genuine dispute that further justifies our decision to let a jury work it out. Again, at this stage of the case, it's our job to "draw all factual inferences in favor of" Torres, not Wal-Mart. *Carroll v. Carnival Corp.*, 955 F.3d 1260, 1262 (11th Cir. 2020).

*     *     *

While businesses "are not general insurers of their" customers, *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 726–27 (11th Cir. 2019) (Sutton, J., sitting by designation & concurring in part), they still bear certain obligations towards their customers. In our case, there's more than enough evidence for a reasonable jury to find that Wal-Mart *should have known* about the water collecting on its floor and that it was *negligent* in failing to clean it. And, to the extent Wal-Mart is right—that there remain here certain unresolved, but important, factual disputes—we think it beyond cavil that the task of resolving those disputes rests squarely with a jury of laymen, not a panel of (unelected) judges. *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343–44 (1979) (Rehnquist, J., dissenting) ("Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense, the 'passional elements in our nature,' and thus keep the administration of law in accord with the wishes and feelings of the community" (citing OLIVER WENDELL HOLMES, COLLECTED LEGAL PAPERS 237 (1920))).

## B.    Causation

Torres can prove causation through the testimony of his treating physician. "When the causal link between alleged injuries and the incident at issue is not readily apparent to a lay person, expert medical testimony as to medical causation is typically required." *Rivera v. Royal Caribbean Cruises Ltd.*, 711 F. App'x 952, 954-55 (11th Cir. 2017). The parties appear to agree that, because back injuries are

not "readily apparent," Torres will need expert testimony to prove causation. MSJ at 12; MSJ Response at 7. And the parties are probably right. *See, e.g., Easterwood v. Carnival Corp.*, 2020 WL 7042643, at *17 (S.D. Fla. Dec. 1, 2020) (Bloom, J.) ("Florida courts have held that a plaintiff's back pain and other soft tissue injuries are not readily observable medical conditions." (quoting *Rementer v. United States*, 2015 WL 5934522, at *2 (M.D. Fla. Oct. 9, 2015))).

To comply with this requirement, Torres offers the testimony of his treating physician, Dr. Cameron. In its motion for summary judgment, Wal-Mart asks us to exclude Dr. Cameron's opinions for three reasons. *First*, Wal-Mart says that Dr. Cameron cannot offer any opinions that "go beyond those arising from treatment"—including on causation—because Dr. Cameron provided only a written summary under Federal Rule of Civil Procedure 26(a)(2)(C), and not a full expert report under Rule 26(a)(2)(B). MSJ Reply [ECF No. 40] at 9. *Second*, although Wal-Mart never moved to compel a Rule 26(a)(2)(C) summary, it now says that Dr. Cameron's written summary is incomplete. *Id.* at 8. *Third*, Wal-Mart complains that Dr. Cameron's written summary was provided two weeks late. *Id.* We reject all three contentions.[12]

### 1. Treating Physicians May Testify about Causation under Rule 26(a)(2)(C)

Because there's no indication that Dr. Cameron is a *retained* expert, he's entitled to testify as an expert under Rule 26(a)(2)(C)—including on the issue of causation—*without* providing a Rule 26(a)(2)(B) written report.

Rule 26(a)(2) "requires a party to disclose 'the identity of any [expert] witness it may use at

---

[12] Wal-Mart never really fleshes out *any* of these arguments in its motion—which is probably reason enough to disregard them. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."). Nonetheless—and in fairness to Wal-Mart—we'll address the contentions Wal-Mart offered in its Reply. *See* MSJ Reply at 6–9.

trial' and other information that varies depending on the expert." *Izquierdo v. Certain Underwriters at Lloyd's London Subscribing to Pol'y No. BB014330K-3830*, ___ F. App'x ___, 2021 WL 3197008, at *3 (11th Cir. July 29, 2021) (quoting FED. R. CIV. P. 26(a)(2)(A)). A detailed written report is required "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." FED. R. CIV. P. 26(a)(2)(B). Experts who don't fit into this definition are subject to less-burdensome disclosure requirements: as relevant here, they're "not required to provide a written report"; instead, they must submit only a written summary setting out "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C).[13]

---

[13] The Rule, in pertinent part, reads as follows:

> (A) *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.
> (B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
> > (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> > (ii) the facts or data considered by the witness in forming them;
> > (iii) any exhibits that will be used to summarize or support them;
> > (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> > (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> > (vi) a statement of the compensation to be paid for the study and testimony in the case.
> (C) *Witnesses Who Do Not Provide a Written Report.* Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
> > (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
> > (ii) a summary of the facts and opinions to which the witness is expected to

And so, in a case like ours, the difference between an expert who must provide a full report under Rule 26(a)(2)(B) and an expert who must submit only a summary under Rule 26(a)(2)(C) boils down to whether the expert was "retained . . . to provide expert testimony in the case." FED. R. CIV. P. 26(a)(2)(B), (C); *see also Goncharenko v. Royal Caribbean Cruises, Ltd.*, 734 F. App'x 645, 646 n.1 (11th Cir. 2018) ("If the expert is one retained . . . to provide expert testimony in the case . . . the party must provide a written report from that expert." (cleaned up)). As the advisory committee's notes to Rule 26 make clear, treating physicians generally function as *non-retained* experts: "The requirement of a written report in paragraph (2)(B) . . . applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report." FED R. CIV. P. 26 advisory committee's notes to 1993 amendment.

As Wal-Mart points out, despite the plain language of the Federal Rules, courts in this District have repeatedly held that "treating physicians offering opinions *beyond those arising from treatment* are experts from whom full Rule 26(a)(2)(B) reports are required." *In re Denture Cream Prod. Liab. Litig.*, 2012 WL 5199597, at *4 (S.D. Fla. Oct. 22, 2012) (Altonaga, J.) (emphasis added); *see also Pringle v. Johnson & Johnson*, 2019 WL 6723822, at *2 (S.D. Fla. Dec. 11, 2019) (Marra, J.) ("[T]reating physicians may be subject to section (2)(B) if they offer opinions that extend beyond their treatment of a patient or if they form opinions upon review of information provided by an attorney or in anticipation of litigation."); *Cajule Cedant v. United States*, 2021 WL 2895714, at *4 (S.D. Fla. July 9, 2021) (Scola, J.) ("[W]hen a treating physician or provider ventures beyond observation, diagnosis, and treatment . . . ,

---

testify.

FED. R. CIV. P. 26(a)(2).

then he or she must provide a full report[.]" (cleaned up)); *Torres v. First Transit, Inc.*, 2018 WL 3729553, at *2 (S.D. Fla. Aug. 6, 2018) (Bloom, J.) ("When a treating physician testifies regarding opinions formed and based upon observations made during the course of treatment, the treating physician need not produce a Rule 26(a)(2)(B) report. By contrast, treating physicians offering opinions beyond those arising from treatment are experts from whom full Rule 26(a)(2)(B) reports are required." (cleaned up)).

But this artificial division—between opinions the treating physician formed *during* the course of treatment and opinions he formulated *after*—has no basis in law. So, for instance, the distinction appears nowhere in the plain text of the Federal Rules. *Cf. Sargeant v. Hall*, 951 F.3d 1280, 1283 (11th Cir. 2020) ("We give the Federal Rules of Civil Procedure their plain meaning." (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540 (1991))); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). To be "retained," after all, means "to [be] ke[pt] in pay or in one's service," *Retain*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY; to be "engaged in service" or "employed," *Retain*, OXFORD ENGLISH DICTIONARY; or to be "hire[d]" or "engage[d] for the provision of services," *Retain*, BLACK'S LAW DICTIONARY.[14]

Under the text's ordinary meaning, then, we ask only whether the medical professional was "hired," "employed," or "engaged" to provide expert testimony in the case. *United States v. Lopez*, 590

---

[14] When examining this question, courts also routinely use the terms "hire" and "retain" interchangeably. *See, e.g.*, *Lance v. Warden, Ga. Diagnostic Prison*, 706 F. App'x 565, 567 (11th Cir. 2017) ("hire expert witnesses"); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 861 n.16 (11th Cir. 1983) ("hired the expert" and "retained the expert"); *Holderbaum v. Carnival Corp.*, 2015 WL 4945736, at *4 (S.D. Fla. Aug. 20, 2015) (Goodman, Mag. J.) ("retained and hired as Carnival's expert"); *Goodman v. Tatton Enters., Inc.*, 2012 WL 12540024, at *16 (S.D. Fla. June 1, 2012) (Rosenbaum, Mag. J.) (noting that "the only expert ever retained in this matter was hired [earlier]").

F.3d 1238, 1248 (11th Cir. 2009) ("To ascertain ordinary meaning, courts often turn to dictionary definitions for guidance."). Experts who *are* so employed must supply a full written report; those who *aren't* can get by with only a summary. And, in the usual slip-and-fall case, the treating physician is involved in the litigation, *not* because he's been hired to provide testimony, but because he's been treating the plaintiff's injuries.[15] In most cases, treating physicians are not, in other words, the classic "retained" expert—the kind that's hired to testify for (and can be fired by) the plaintiff's legal team.[16]

What's clear from this textual exegesis, in sum, is that the question courts typically ask—did the treating physician form his opinion during or after treatment?—is *really* irrelevant to the inquiry. That's because whether the physician formed his opinion during or after treatment has no bearing on whether the physician has been "retained." In this respect, of course, the analysis courts typically engage in is both over- and under-inclusive: a treating physician who *was* hired to provide testimony has been "retained" *even if* he formed his opinion *during* treatment; and a treating physician who was *not* hired to provide testimony isn't "retained" *even if* he formed his opinion *after* treatment. And there's nothing about the questions the physician is asked or the answers he gives—about causation or anything else—that suddenly transforms him from a non-retained to a retained expert. The point is this: in distinguishing between those experts who must provide written reports and those who don't, the Federal Rules instruct us to look, not at what the expert *examines*, but only at what he *is* (*i.e.*, hired or not hired). And we needn't speculate further about whether this Rule makes sense because, "[i]f

---

[15] Interestingly, just because a treating physician was retained for one purpose (to provide medical treatment) doesn't automatically mean that he was retained for another (to offer testimony). *See* 3 CORPUS JURIS SECUNDUM, AGENCY § 601 (updated June 2021) ("Evidence sufficient to establish an agency for one purpose does not tend to prove the existence of an agency for another entirely different purpose.").

[16] A treating physician may nevertheless "morph" into a retained expert. Imagine, for instance, a plaintiff who's injured and goes to the doctor for his back pain. Imagine, too, that, as litigation approaches, the plaintiff's legal team pays the doctor and formally engages him to provide expert testimony. In this scenario, it may make sense to say that the treating physician has changed roles and is now functioning as a retained expert.

Congress had wanted" us to use a different metric, "it would have said so." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1172 (11th Cir. 2008).

Even looking beyond the text of the Federal Rules, though, we find little to commend the standard view on this question. Take, for instance, the advisory committee's notes. "Although not binding, the interpretations in the Advisory Committee Notes [of the Federal Rules of Civil Procedure] are nearly universally accorded great weight in interpreting federal rules." *Horenkamp v. Van Winkle And Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005) (cleaned up). Those notes support our construction of the Rule. As relevant here, those notes say that "[a] witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and *also provide expert testimony* under [the Federal Rules of Evidence]." FED. R. CIV. P. 26 advisory committee's notes to 2010 amendment (emphasis added). And those notes cite "physicians or other health care professionals" as the *paradigmatic* examples of witnesses who can testify as experts under 26(a)(2)(C). *Id.* Crucially, the committee notes *never* suggest that treating physicians entitled to "provide expert testimony" under Rule 26(a)(2)(C) are in any way constrained to providing only those opinions they formed *during* treatment.

In reaching the opposite result, most courts entertain (improperly, to our mind) a-textual reflections that elevate considerations of policy over the plain meaning of the Rule's text. *Cf. Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007) (acknowledging that the after-treatment limitation is based on a "*purposive* reading of Rule 26" (emphasis added)). "[S]everal [c]ourts," in fact, "have pointed to, and struggled with, an absence of guidance in the law on how to ensure that various opinions offered by treating physicians are sufficiently disclosed prior to expert discovery and trial" and—to promote these "sufficient[] disclos[ures]"—have "required expert reports under FRCP 26(a)(2)(B) where the treating physician intends to offer opinions based upon information the opposing side cannot easily glean from medical records." *In re World Trade Ctr. Lower Manhattan Disaster*

*Site Litig.*, 2014 WL 5757713, at *5 (S.D.N.Y. Nov. 5, 2014).[17]

Those policy considerations may have been persuasive—compelling even—before Rule 26 was amended in 2010.[18] Before the 2010 amendments, there were vast differences in the disclosure

---

[17] The rule courts have (apparently) devised—that a physician must produce a full report if he forms his opinion *after* treatment or on the basis of information that's *outside* his records—appears overbroad in any case. As one commentator has noted:

> Physicians often continue to think about their patients after treatment has ended, so there is no reason to draw an arbitrary line at the conclusion of an office visit. Further, there are only a limited number of topics a physician may address in his testimony (i.e., diagnosis, treatment, prognosis, causation, permanency, or disability), and these topics are not a surprise to any lawyer who litigates toxic tort or personal injury cases. The key issues are whether Rule 26(a)(2) should be construed to encourage treating-physician participation in litigation and how to provide appropriate notice of their testimony so that the other side is not prejudiced.

> Requiring a physician to prepare a written report creates additional, unrecoverable costs, which disproportionately impact cases with smaller claims for damages. A summary report that discloses the subject matter . . . and a summary of the facts and opinions to which the physician will testify should adequately disclose any new opinions formed after treatment to prevent surprise and enable the other party to depose the physician on the topics identified in the summary report. Therefore, a physician who forms a new opinion without reviewing additional materials should not have to prepare a written report, but the party presenting the physician's testimony should prepare a summary disclosure under Rule 26(a)(2)(C).

William P. Lynch, *Doctoring the Testimony: Treating Physicians, Rule 26, and the Challenges of Causation Testimony*, 33 REV. LITIG. 249, 272–73 (2014).

[18] As one court has noted: "Before the 2010 Amendments to Rule 26(a)(2) the majority of courts in the country concluded that 26(a)(2)(B) reports were not required for treating physicians expressing opinions as to causation, diagnosis and prognosis, and the extent of disability to the extent those opinions were based on treatment of the patient." *Dixon v. Legacy Transp. Sys., LLC*, 2017 WL 4004412, at *6 (D. Nev. Sept. 11, 2017). And at least part of the *present* confusion seems to stem from courts' continued reliance on *pre*-2010 cases to propagate this now-dated distinction between treating physicians who form their opinions during treatment and those who formulate them after. *See, e.g.*, *In re Denture*, 2012 WL 5199597, at *4 (relying in part on *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011) and *Meyers v. National R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734–35 (7th Cir. 2010), neither of which references Rule 26(a)(2)(C)). We've identified only one circuit court opinion that mentions Rule 26(a)(2)(C) in interpreting the concept of retention—but even that decision only referenced the amendments in a footnote and relied on two pre-2010 district court decisions to "conclude that as long as an expert was not retained or specially employed in connection with the litigation, *and his opinion about causation is premised on personal knowledge and observations made in the*

requirements that applied to retained and non-retained experts: whereas retained experts had to disclose *full* expert reports, non-retained experts didn't have to disclose *anything*. Because of this disparity, courts understandably felt a strong impulse, whenever the call was close, to classify the expert as retained and to require disclosure. This was necessary, many courts believed, to give the other side adequate notice of the physician's testimony.[19] But, in the 2010 amendments, Congress added Section (C) to Rule 26(a)(2)—which, as we've seen, requires non-retained experts to submit written summaries. *See* FED. R. CIV. P. 26(a)(2)(C) (requiring non-retained experts to supply "a summary of the facts and opinions to which the witness is expected to testify"); FED. R. CIV P. 26 advisory committee's notes to 2010 amendment (noting that non-retained expert must also provide "the facts

---

*course of treatment*, no report is required under the terms of Rule 26(a)(2)(B)." *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 7 (1st Cir. 2011) (emphasis added).

[19] *See, e.g.*, *Meyers*, 619 F.3d at 734 ("The purpose of the report is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response."); *Carbaugh v. Home Depot U.S.A., Inc.*, 2014 WL 3543714, at *3 (D. Colo. July 16, 2014) ("[B]ecause treating physicians presumably keep medical records documenting their observations, findings, and treatment regimes, a written report usually would be unnecessary."); *Crabbs v. Wal-Mart Stores, Inc.*, 2011 WL 499141, at *2 (S.D. Iowa Feb. 4, 2011) ("The reasons for requiring a report for treating physician opinions seen as beyond the scope of treatment are to effectuate the purpose of the report requirement to give fair notice of opinion testimony and time for the opponent to prepare, and to recognize that as attorneys discuss the case with their injured client's doctor, the doctor may be asked to give opinions for the purpose of the litigation beyond those determined at the time of treatment."); *Colter v. Rockwell Automation, Inc.*, 2009 WL 7450978, at *3 (N.D. Ind. Nov. 18, 2009) (requiring a treating physician to provide an expert report and reasoning that the "disclosure requirements . . . are designed to aid the court in its fact finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case" (cleaned up)); *Kim v. Time Ins. Co.*, 267 F.R.D. 499, 502 (S.D. Tex. 2008) ("[C]ourts have considered the purposes behind Rule 26(a)(2)(B) and the fairness of requiring a Defendant to proceed without the benefit of an expert report when determining whether to require a treating physician to provide an expert report."); *Griffith v. Ne. Illinois Reg'l Commuter R.R.*, 233 F.R.D. 513, 518 (N.D. Ill. 2006) ("When a treating physician's testimony is limited to his observation, diagnosis and treatment, the medical records provide a significant amount of information about the physician's likely testimony."); *Sprague v. Liberty Mut. Ins. Co.*, 177 F.R.D. 78, 81 (D.N.H. 1998) ("The unretained experts, who formed opinions from pre-litigation observation, invariably have files from which any competent trial attorney can effectively cross-examine. The retained expert, who under the former interrogatory rule frequently provided sketchy and vague answers, has no such files and is thus required to provide the report to enable effective cross-examination.").

supporting [the expert's] opinions"). Under *this* framework, then, there's little reason to fear that the

other side—here, the defense—will be surprised by an expert whose testimony it never had the chance

to (fully) examine. In this respect, the committee's notes make clear that the "amendment resolves a

tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from

witnesses exempted from the report requirement." FED. R. CIV P. 26 advisory committee's notes to

2010 amendment.[20]

     And, to the extent any individual judge remains concerned that, in a given case, a Rule

26(a)(2)(C) summary would constitute insufficient notice to the other side, the new rules expressly

give district courts the discretion to require more fulsome disclosures—beyond those prescribed in

Section (C)—for non-retained experts. *See* FED. R. CIV. P. 26(a)(2)(C) ("*Unless otherwise stipulated or*

*ordered by the court*, if the witness is not required to provide a written report, this disclosure must state .

. . ." (emphasis added)). This discretion, of course, vitiates the need to read any such limitation on a

treating physician's testimony into the rules. But here's the rub: whether we agree with the Rule or

not—whether we think its policy rationales makes sense or not—we judges "aren't free to rewrite

---

[20] The minutes from the advisory committee's meetings are pellucid on this point, describing the impetus for Rule 26(a)(2)(C) as follows:

> One set of issues arises from rather frequent disregard of Rule 26(a)(2)(B) limits on trial expert disclosure reports. The rule requires a report only if the witness is retained or specially employed to provide expert testimony in the case or is a party's employee whose duties as an employee regularly involve giving expert testimony. A number of courts, however, reasoning that reports are a good thing, have required reports from employee experts who do not regularly give expert testimony.

> A related set of issues affect treating physicians. It has proved difficult to draw a line that identifies the point at which a physician's testimony becomes that of an expert retained or specially employed to provide expert testimony. *The difficulty may mean that a party who has relied on a treating physician to provide testimony on issues that go beyond treatment finds the testimony excluded for want of a Rule 26(a)(2)(B) report.*

CIVIL RULES ADVISORY COMMITTEE MEETING MINUTES (Apr. 2008) (emphasis added), https://www.uscourts.gov/sites/default/files/fr_import/CV04-2008-min.pdf.

clear statutes under the banner of our own policy concerns." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1815 (2019); *see also Mamani v. Berzain*, 825 F.3d 1304, 1310 (11th Cir. 2016) ("[U]nless and until the first and third branches of government swap duties and responsibilities, we cannot rewrite statutes.").[21]

We aren't alone in questioning the wisdom of relying on pre-2010 cases to confine non-retained physicians to the opinions they formed during treatment. In *Kristensen ex rel. Kristensen v.*

---

[21]      There may have been *several* reasons for making "retention" the distinguishing criterion, as opposed to some other factor—such as, say, whether the opinion was formed during or after treatment.

First, as the advisory committee's notes explain, non-retained experts "may not be as responsive to counsel as those who have" been hired. FED. R. CIV. P. 26 advisory committee's notes to 2010 amendment. In other words, retained experts (who are paid and can be fired) are more likely to be bound to counsel—a potentially bias-forming connection that may render it all the more important for the other side to test the expert's theories by reference to a *full* report.

Second, many litigants may have a tough time persuading non-retained experts to prepare and submit full reports. That's because, while retained experts are paid for their work (and their time), non-retained experts aren't. *See* 8A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2031.2 (3d ed. 2021) ("It is widely known that lawyers have difficulty persuading such doctors to spend time preparing for trial, and insisting on a burdensome report before they could be called to testify might unduly interfere with the right of patients to present claims or defenses in court. It seemed clear that the treating physician example was one reason why the Advisory Committee did not impose a report requirement on all testifying experts in 1993."); REPORT OF THE CIVIL RULES ADVISORY COMMITTEE (May 8, 2009) ("The advantages hoped to be gained from Rule 26(a)(2)(B) reports so impressed several courts that they have ruled that experts not described in Rule 26(a)(2)(B) must provide (a)(2)(B) reports. The problem is that attorneys may find it difficult or impossible to obtain an (a)(2)(B) report from many of these experts, and there may be good reason for an expert's resistance. *Common examples of experts in this category include treating physicians* and government accident investigators. They are busy people whose careers are devoted to causes other than giving expert testimony.") (emphasis added), https://www.uscourts.gov/sites/default/files/fr_import/CV05-2009.pdf.

Third, although treating physicians and professional experts may both have M.D.'s, they often play different roles—and come to the stand with different incentives. The retained expert (who never treated the patient) doesn't have an overarching medical objective: he doesn't really care about the success or failure of the treatment someone else prescribed; he only has to provide helpful testimony. The treating physician, by contrast, cares about the patient's *physical* well-being—if only because he wants to see his treatment succeed. Given the absence of a natural check on the retained expert's credibility, additional disclosures may be warranted.

In summary, we can justify either reading of the Rule's *purpose* by reference to any number of policy considerations. But, since we cannot know which of these policy considerations the drafters had in mind, we should stick to what they *said*—rather than to what we think they might have *intended*.

*Spotnitz*, 2011 WL 5320686, at *4 (W.D. Va. June 3, 2011) (Moon, J.), for instance, the district court doubted that a treating physician had to provide a report "to opine on information learned outside of the course of treatment." *Id.* As that court reasoned:

> I have some reservations about the viability of [pre-2010 decisions limiting a treating physician's opinions to those formed during treatment] after the implementation of Rule 26(a)(2)(C). The express language of Rule 26(a)(2)(B) applies the expert report requirement only to a "witness . . . retained or specially employed to provide expert testimony in the case[.]" Meanwhile, the Advisory Committee notes to Rule 26(a)(2)(C) explain that the section was added to "resolve[] a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) *even from witnesses exempted from the report requirement*." (emphasis added). The statement appears to address the very situation covered [in pre-2010 decisions], and there is no reason to conclude that [the treating physician] was "retained or specially employed" for this case. Rather, Plaintiffs' counsel has proffered that [the treating physician] is not on retainer, and that she was the [Plaintiffs'] treating physician well before [the Plaintiffs] commenced this litigation, or even sought counsel.

*Id.*

Similarly, in *Bostick v. State Farm Mut. Auto. Ins. Co.*, 2017 WL 2869967, at *2 (M.D. Fla. July 5, 2017) (Covington, J.), the court explained that, "[u]nder the *plain language* of Rule 26(a)(2)(B), [the] treating physicians were not required to provide written reports because they were not retained or specially employed to provide expert testimony." *Id.* (emphasis added). And so, the plaintiff was only "required to comply with Rule 26(a)(2)(C) for the treating physicians to testify beyond observations made during the course of their treatment." *Id.*

In *O'Leary v. Kaupas*, 2012 U.S. Dist. LEXIS 95769, at *4 (N.D. Ill. July 11, 2012) (Kocoras, J.), the district court likewise noted that the "witnesses in [the] case appear[ed] to be of the very kind that the Advisory Committee had in mind when promulgating Subpart C — non-retained treating physicians providing expert testimony," and that "[i]n light of Subpart C, the fact that [the] experts formed their opinions after treatment does not require an expert disclosure under Rule 26(a)(2)(B)." *Id.*

Even the academics are joining the fray. As one recent treatise has observed: "[t]he amended

Rule focuses exclusively on whether the expert was retained, not the nature of the activity that the expert engaged in to form conclusions." David H. Kaye *et al.*, THE NEW WIGMORE: A TREATISE ON EVIDENCE § 4.2.2 (3d ed. 2021). In the view of these professors, it's simply unnecessary to require full expert reports from treating physicians: "in the case of non-retained percipient witnesses whose testimony goes beyond the scope of treatment, . . . requiring a full report notwithstanding the rule would seem appropriate and well within the discretion explicitly built into the rule." *Id.*[22]

One last thing. To what extent does a physician who testifies under a letter of protection qualify as a "retained" expert?[23] Neither party briefs the issue, and few courts have addressed it. Admittedly, the policy reasons for requiring *only* retained experts to provide full reports apply with less force to a treating physician who operates under a letter of protection. That's because a treating physician under a letter of protection may be more partial towards the plaintiff—even if he isn't *retained*—and (thus) may be more willing to draft an expert report. At the same time, as compared with

---

[22] *See also Coleman v. Am. Fam. Mut. Ins. Co.*, 274 F.R.D. 641, 645 (N.D. Ind. 2011) (Rodovich, Mag. J.) ("The *Meyers* court explained that the determining factor is whether the physician determined the cause of the individual's injuries during or after treatment. . . . However, after *Meyers* was decided, Rule 26 was amended effective December 2010, to resolve the tension that led some courts to require expert reports of non-retained experts. . . . The amendment to Rule 26 was added to address concerns about expert testimony, including courts requiring detailed reports from experts who were not retained for the purpose of giving expert testimony. It would be difficult to conclude that the treating physicians identified here were retained for the express purpose of giving expert testimony. . . . Nothing in the record suggests that the treating physicians were sought for any purpose except treatment. Because the amendment to Rule 26 attempts to clarify the distinction between an expert retained to testify and one who will testify for reasons independent of trial preparation, the court finds that the amendment overcomes the holding in *Meyers* as far as the physicians at hand are concerned because of the purpose for which they were first sought. For this reason, the treating physicians are not required to submit a complete expert report.").

[23] "A letter of protection is a document sent by an attorney on a client's behalf to a health-care provider when the client needs medical treatment but does not have insurance. Generally, the letter states that the client is involved in a court case and seeks an agreement from the medical provider to treat the client in exchange for deferred payment of the provider's bill from the proceeds of [a] settlement or award; and typically, if the client does not obtain a favorable recovery, the client is still liable to pay the provider's bills." *Johnson v. Carnival Corp.*, 2021 WL 1379209, at *3 (S.D. Fla. Apr. 12, 2021) (quoting Caroline C. Pace, *Tort Recovery for Medicare Beneficiaries: Procedures, Pitfalls and Potential Values*, 49 HOUS. LAW. 24, 27 (2012)).

a retained expert, a treating physician operating under a letter of protection is still *less* bound to the plaintiff's attorney. The treating physician, unlike a retained expert, can always choose *not* to testify without relinquishing his right to compensation. Moreover, contra the retained expert, the treating physician isn't paid for his time on the case (whether that's time spent writing a report, reviewing the evidence, or testifying) and, in many cases, will have a full patient load to deal with—rendering an expert report unduly burdensome. In any event, to the extent certain judges feel that letters of protection present special problems, Rule 26(a)(2)(C) (as we've said) gives courts the discretion to require full expert reports from treating physicians who, as it were, have some skin in the game.

At least one court in our Circuit has found that "a physician may agree to a letter of protection to defer payment for that treatment without becoming a retained expert." *Perez v. United States*, 2021 WL 3371498, at *3 (M.D. Fla. Aug. 3, 2021) (Flynn, Mag. J.) (cleaned up). That makes sense. The letter of protection, after all, is just a way of paying the physician for the treatment he's *already* provided. It thus doesn't compensate the physician *at all* for the work he performs in the litigation. Again, the text of the Rule is clear: unless a treating physician is hired *for* his testimony, that physician hasn't been "retained . . . to provide expert testimony in the case." FED. R. CIV. P. 26(a)(2)(B), (C).

These principles easily dictate the result in our case: Torres's treating physician—Dr. Cameron—can offer expert opinions on the question of causation, *regardless of when his opinions were formed*. That's because there's *no* indication that Torres (or his legal team) *retained* Dr. Cameron to provide testimony in this case. *See* MSJ Response at 6 (representing that Dr. Cameron was "not employed to provide expert testimony"). To the contrary, Torres visited Dr. Cameron a little over a month after his accident at the Wal-Mart. *See* Medical Records at 38. Dr. Cameron examined, treated, and advised Torres—and later performed surgery on his back. *Id.* at 92; *see also* Torres Dep. at 21:9–29:2. Dr. Cameron was thus Torres's treating physician *long before* this litigation commenced. And, although Torres *may* have signed a letter of protection with Dr. Cameron, *see id.* at 32:19–34:5, Wal-

Mart (1) never claims (in its briefing or elsewhere) that Torres *did* sign that letter, (2) never filed any such letter, and (3) never contends that Dr. Cameron was retained for this litigation.[24] Because there's *no evidence* in the record for the proposition that Dr. Cameron has been retained for work he performed *in this litigation*, he may testify as an expert on the basis of his Rule 26(a)(2)(C) summary.[25]

Even if Wal-Mart were right that parties *are* "entitled to full Rule 26(a)(2)(B) reports [whenever an expert's] opinions go beyond those arising from treatment," MSJ Reply at 9 (quoting *In re Denture*, 2012 WL 5199597, at *5), Wal-Mart's motion would still fail. That's because, as many courts have recognized, physicians who form their causation opinions *during* treatment can offer those opinions under Rule 26(a)(2)(C)—even without a Rule 26(a)(2)(B) report. *See, e.g., Torres*, 2018 WL 3729553, at *3 ("[B]ecause a treating physician considers not only the plaintiff's diagnosis and prognosis, opinions as to the cause of injuries do not require a written report if based on the examination and treatment of the patient." (quoting *Levine v. Wyeth Inc.*, 2010 WL 2612579, at *1 (M.D. Fla. June 25, 2010)

---

[24] By failing to cite any evidence that Dr. Cameron is subject to a letter of protection—and by omitting any argument that such a letter rendered Dr. Cameron "retained for the purposes of providing expert testimony"—Wal-Mart has waived that contention. *See Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991) ("An argument not made is waived . . . ."); *see also A.L. v. Jackson Cnty. Sch. Bd.*, 635 F. App'x 774, 786 (11th Cir. 2015) (noting that Federal Rule of Civil Procedure 56(c)(3) "makes clear that the district court need not consider materials not cited by the parties" and finding that a party "waived [its] claims by . . . failing to bring to the court's attention evidence that supported [its] claims").

[25] Of course, Dr. Cameron's opinions must still satisfy the strictures of *Daubert*. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1316 n.23 (11th Cir. 2014) (noting that "a treating doctor . . . is providing expert testimony if the testimony consists of opinions based on scientific, technical, or other specialized knowledge regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation" (cleaned up)); *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317–18 (11th Cir. 2011) ("[W]hen a treating physician's testimony is based on a hypothesis, not the experience of treating the patient, it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702 and the strictures of *Daubert*."); *Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 712–13 (11th Cir. 2008) ("Although we agree that a treating physician may testify as a lay witness regarding his observations and decisions during treatment of a patient, once the treating physician expresses an opinion unrelated to treatment which is 'based on scientific, technical, or other specialized knowledge,' that witness is offering expert testimony for which the court must perform its essential gatekeeping function as required by *Daubert*.").

(Covington, J.))).[26] In this scenario, the physician's causation opinions need only be "sufficiently related to the information disclosed during the course of Plaintiff's treatment[.]" *Id.* (quoting *Levine*, 2010 WL 2612579, at *1).

And that's precisely what we have here. Dr. Cameron formed his opinion—that Torres injured his back during a recent slip-and-fall—based on his extensive treatment of Torres's injuries. Indeed, in his Initial Report—drafted long before this case was filed—Dr. Cameron determined that Torres was injured when he slipped at a Wal-Mart. *Compare* Medical Records at 38 (dated Dec. 21, 2017) *with* Compl. (filed Aug. 2, 2019). And his Rule 26(a)(2)(C) summary explains that his "opinions as to [causation] were formed based upon his experience, training, *and care and treatment* of Plaintiff." Torres's Written Summary [ECF No. 32-4] (emphasis added). This is unsurprising. Treating physicians, after all, "commonly consider the cause of any medical condition presented in a patient." *Torres*, 2018 WL 3729553, at *3 (quoting *Jones v. Royal Caribbean Cruises, Ltd.*, 2013 WL 8695361, at *5 (S.D. Fla. Apr. 4, 2013)). Even under Wal-Mart's preferred "during-the-course-of-treatment" test, then, Wal-Mart loses. *See Powers v. Target Corp.*, 2020 WL 1986968, at *3 (S.D. Fla. Apr. 27, 2020) (Bloom, J.) (finding that, because the treating physicians' "opinions are based on their care and treatment of Plaintiff, . . . they may testify as to their opinions on causation . . . if these opinions are sufficiently related to information disclosed during the care and treatment of Plaintiff" (cleaned up)).[27]

---

[26] *See also Everett v. Am. Gen. Life Ins. Co.*, 703 F. App'x 481, 482–83 (9th Cir. 2017) (concluding that a non-retained physician may testify about the "cause of death" under Rule 26(a)(2)(C) if his opinion was "formed during the course of treatment"); *Bostic v. Royal Caribbean Cruises Ltd.*, 2020 WL 9459287, at *5 (S.D. Fla. Sept. 11, 2020) (Cooke, J.) ("Thus, where the expert is part of the ongoing sequence of events and arrives at his causation opinion during treatment, his opinion testimony is not that of a retained or specially employed expert."); *Jones v. Disc. Auto Parts, LLC*, 2017 WL 1396477, at *9 (M.D. Fla. Apr. 19, 2017) (Dalton, J.) ("[I]f a physician's opinion regarding causation or any other matter was formed and based on observations made during the course of treatment, then no Rule 26(a)(2)(B) report is required." (cleaned up)).

[27] As we explain more fully below, *even if* treating physicians *were* prohibited from offering causation opinions they formulated during treatment, we'd still find that Dr. Cameron's failure to submit a 26(a)(2)(B) report was "harmless." FED. R. CIV. P. 37(c)(1).

## 2.  Any Deficiencies in Torres's Rule 26(a)(2)(C) Summary Were Harmless

Although Torres's Rule 26(a)(2)(C) summary was—in some respects—incomplete, we find its deficiencies entirely harmless. For a non-retained expert to offer expert testimony, the offering party must disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C). While the summary Rule 26(a)(2)(C) requires "is considerably less extensive than the report required by Rule 26(a)(2)(B)," FED. R. CIV. P. 26 advisory committee's notes to 2010 amendment, a party must do more than "identify[] generic subject areas of anticipated testimony, without identifying the actual substance or content of the opinions on which testimony is expected," *Almonte v. United States*, 2021 WL 3418402, at *3 (S.D. Fla. Apr. 21, 2021) (Marra, J.). "[T]he expert witness should do more than merely produce [medical] records." *Sweat v. United States*, 2015 WL 8270434, at *2 (M.D. Fla. Dec. 8, 2015).

Wal-Mart is right that Torres's 26(a)(2)(C) summary is deficient. That summary *does* set out the "subject matter" of Dr. Cameron's expected testimony. FED. R. CIV. P. 26(a)(2)(C)(i). For example, it discloses that Dr. Cameron will testify about the following:

> [Dr. Cameron's] care and treatment of Plaintiff, as well as his opinion as the Plaintiff's treating physician related to the necessity of past and future medical care and treatment, the relation/cause of past and future medical care and treatment to the incident in the instant claim, the necessity and cost of past and future medical care and treatment, any permanency or any impairment related to the incident in the instant claim, the need and estimated cost of future medical care and treatment and prescription medications, therapy and other related medical needs as related to the injuries sustained by the Plaintiff in the instant claim.

*See* Torres's Written Summary. At the same time, Torres never outlines "a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C)(ii). Torres's summary only says that "Dr. Cameron's opinions as to the issues outlined above were formed based upon his experience, training, and care and treatment of Plaintiff," and that "[c]opies of Dr. Cameron's medical records/reports have been previously provided to the Defendant." Torres's Written Summary. In

addition, Torres never describes the specific *opinions* Dr. Cameron will be offering. And his vague

allusions to "experience, training, and care" don't really explain the *facts* Dr. Cameron relied on. In this

respect, Torres's voluminous records dump doesn't *really* comply with his obligation to give Wal-Mart

a "summary" of those facts.

In similar circumstances, courts have found that treating-physician summaries fell short of the

disclosures required by Rule 26(a)(2)(C). In *O'Brien v. NCL (Bahamas) Ltd.*, 2017 WL 8315925, at *2

(S.D. Fla. Aug. 25, 2017) (Lenard, J.), for instance, the district court found insufficient a written

summary that—like Torres's—disclosed the subject matter of the treating physician's testimony but

only generally referred the defendant to the plaintiff's medical records. That "summary," the court

said, "fail[ed] to provide sufficient factual information." *Id.* at *6. We reach the same conclusion here.

Similarly, in *Leibson v. TJX Companies, Inc.*, 2018 WL 3868708, at *3 (M.D. Fla. Aug. 14, 2018)

(Covington, J.), the court recognized that the "mere reference to 'damages and medical treatment' as

the subject matter of the treating physicians' testimony does not satisfy Rule 26(a)(2)(C)." That's

because the plaintiff "provided no summaries of the facts and opinions to which the witnesses are

expected to testify, as required by Rule 26(a)(2)(C)." *Id.* The same is true here: while Torres outlined

the subject matter of Dr. Cameron's testimony, he never provided a legitimate summary of the facts

and opinions Dr. Cameron will be testifying about.

But these relatively minor deficiencies don't entitle Wal-Mart to the judgment it's so hard after.

In general, "[i]f a party fails to properly disclose an expert witness under Rule 26(a), the party may not

use the witness 'unless the failure was substantially justified or is harmless.'" *Izquierdo*, ___ F. App'x

___, 2021 WL 3197008, at *4 (quoting FED. R. CIV. P. 37(c)(1)). In deciding whether exclusion is

appropriate, the Eleventh Circuit has instructed courts to consider "the explanation for the failure to

disclose the witness, the importance of the testimony, and the prejudice to the opposing party if the

witness had been allowed to testify." *Id.* (quoting *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1321

(11th Cir. 2008)). Courts also routinely decline to exclude expert testimony when the defendant "had the opportunity to seek the intervention of the Court for [the plaintiff's] purported non-compliance before the discovery cut-off but failed to do so." *Torres*, 2018 WL 3729553, at *2.

These factors compel us to find that any deficiency in Torres's expert summary was harmless. *First*, there's no evidence that Torres's failure to provide a sufficiently detailed summary stemmed from some purposeful strategy to deceive. Quite the opposite: so far as we can tell, the deficient disclosure was simply a mistake. *See Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 607–08 (11th Cir. 2019) (Tjoflat, J., dissenting) (noting that, to avoid exclusion, "the nondisclosure must be a mistake"). *Second*, there's no dispute that Dr. Cameron's testimony is crucial to this litigation. Indeed, Wal-Mart's whole premise is that the Court should enter judgment against Torres *on the merits*—thus ending this litigation and precluding Torres's right to redress—solely because of the report's deficiencies. *Third*, there's no evidence of any harm to Wal-Mart. To the contrary, Wal-Mart was aware of Dr. Cameron's involvement as early as December 3, 2019—when Torres included him in his initial disclosures. *See* Initial Disclosures [ECF No. 37-3]. Months later, on March 13, 2020, Torres identified Dr. Cameron again in response to Wal-Mart's interrogatories and, in doing so, provided *all* of Dr. Cameron's medical bills and records. *See* Response to Interrogatories [ECF No. 37-4] at 7–9. From the very beginning of this case, then, Wal-Mart had all it would ever really need to understand the scope and character of Dr. Cameron's testimony. It's no secret to anyone, after all, that Dr. Cameron will testify that Torres hurt his back when he slipped and fell at Wal-Mart. Wal-Mart, in sum, cannot win the case by feigning surprise today.

Even if Wal-Mart had suffered some harm, that harm was entirely *self-inflicted*. Torres produced his 26(a)(2)(C) summary on August 7, 2020—when the discovery period was still very much open. But Wal-Mart *never* complained about the summary's deficiencies—not to the Court or anyone else. Perhaps most strangely, Wal-Mart *never* deposed Dr. Cameron, *never* conferred with Torres about any

perceived deficiencies in his summary, and *never* moved to compel a compliant expert report.[28] Wal-Mart, in other words, *never* did anything about the deficient summary until, in its motion for summary judgment—filed three months after the summary was turned over and long after discovery had closed—it asked us to throw out Dr. Cameron's testimony and enter judgment against Torres. We won't reward Wal-Mart's "gamesmanship" with an easy win. *Whitmore v. Fed. Express Corp.*, 2017 WL 11537385, at *2 (S.D. Fla. Jan. 5, 2017) (Bloom, J.).

Unsurprisingly, courts routinely reject these sandbagging tactics. In *Griffith v. General Motors Corp.*, 303 F.3d 1276, 1283 (11th Cir. 2002), for instance, the Eleventh Circuit affirmed the district court's refusal to strike an expert on the basis of inadequate disclosures. In doing so, the panel explained that the objecting party should have raised the issue much earlier in the case:

> We do not commend either party on its efforts to resolve this dispute. General Motors would do well to make sure that, in the future, its Rule 26 disclosures comport with both the spirit and the letter of the rule. Nonetheless, Griffith allowed this impasse to continue well beyond the point of good faith efforts to resolve the issue without court intervention, *never* moving for an order requiring any more detailed response under Rule 26.

*Id.* The Eleventh Circuit's reasoning squarely resolves the issue we're faced with here. Like Griffith, Wal-Mart sat on its hands and *never* moved for an order compelling a more detailed disclosure. Since it could have done much more—much earlier—to resolve the summary's deficiencies, its claimed prejudice rings hollow now. *See, e.g., Kroll v. Carnival Corp.*, 2020 WL 4926423, at *5 (S.D. Fla. Aug. 20, 2020) (Goodman, Mag. J.) ("Carnival could have contacted Plaintiff to obtain more-specific information or sought Court intervention to address the purported non-compliance before the discovery deadline expired, but it failed to do so."); *Jones*, 2013 WL 8695361, at *4 ("The problem for Defendant, though, is that it had the ability to compel, and thereby cure any potential surprise, prior to the discovery cutoff, by advising Plaintiff that his disclosures did not comply with the rules and by

---

[28] At least there's no evidence that Wal-Mart did any of these things.

requesting more specific disclosures."); *Kondragunta v. Ace Doran Hauling & Rigging Co.*, 2013 WL 1189493, at *8 (N.D. Ga. Mar. 21, 2013) (Carnes, J.) ("The problem for defendants, though, is that they had the ability to complain, and thereby cure this surprise, prior to the expiration of expert discovery . . . . Defendants did not do so, but instead laid in wait, hoping that plaintiff's non-compliance would doom his ability to offer any expert testimony.").

All of that said, here's what we're going to do: since Dr. Cameron's summary was deficient, we'll **ORDER** Torres to produce a compliant Rule 26(a)(2)(C) summary by August 30, 2021. We'll also reopen discovery for the limited purpose of allowing Wal-Mart to depose Dr. Cameron—if it chooses to do so. That deposition shall take place by September 30, 2021.

### 3.   Torres's Rule 26(a)(2)(C) Summary Will Not Be Excluded as Untimely

In its last stand, Wal-Mart asks us to exclude Dr. Cameron's summary because it was untimely. Torres, it's true, inadvertently served Dr. Cameron's 26(a)(2)(C) summary 14 days after it was due. But, as we've discussed, exclusion is a severe and improper remedy when, as here, the nondisclosure is "harmless." FED. R. CIV. P. 37(c)(1). Wal-Mart hasn't suggested that the late disclosure somehow prejudiced its ability to defend this case. Nor could it now that we've required Torres to resubmit that initial disclosure and to make Dr. Cameron available for deposition. *See, e.g.*, *Long v. E. Coast Waffles, Inc.*, 762 F. App'x 869, 871 (11th Cir. 2019) ("While untimely disclosures are certainly disfavored, we cannot say, on these facts, that the district court manifestly erred in allowing [the expert] to testify. Although Rule 37 certainly permits a district court to exclude a witness based on a party's noncompliance with Rule 26, district courts are entitled to broad discretion in managing pretrial discovery matters."); *Almonte*, 2021 WL 3418402, at *4 (ordering "that [the treating physician] be produced by Plaintiff for a deposition prior to [the physician] testifying at trial" and finding, on that basis, that "the late disclosure of [the treating physician's] report was harmless"); *In re Denture*, 2012 WL 5199597, at *6 ("Because Defendants will neither be surprised nor be prejudiced, Plaintiffs' late

disclosure of Rule 26(a)(2)(B) expert reports should not be remedied by the most extreme of sanctions."); *Ellison v. Windt*, 2001 WL 118617, at *3 (M.D. Fla. Jan. 24, 2001) (requiring the expert to be made available for a deposition before trial and finding, as a result, that "the belated disclosure of [the expert's] report is harmless").

***

After careful review, the Court hereby **ORDERS** and **ADJUDGES** that Wal-Mart's Motion for Summary Judgment [ECF No. 31] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 16th day of August 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record